UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Donald Kern and William Grimm, as
Trustees of the Plasterers & Cabinet
Makers Health Fund,

    Plaintiff,

v.                                                    Civil No. 12-1140 (JNE/AJB)
                                                       ORDER

Goebel Fixture Co.,

    Defendant.

Plaintiffs Donald Kern and William Grimm ("Trustees") brought this action as Trustees of the Plasterers and Cabinet Makers Health Fund against Defendant Goebel Fixture Co. ("Goebel"), alleging claims under Section 301 of the Labor Management Relations Act of 1974 ("LMRA"), 29 U.S.C. § 185 (2006), and Sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132, 1145 (2006). Plaintiffs seek to collect unpaid fringe benefit contributions allegedly owed by Goebel. Now before the Court are the parties' cross-motions for summary judgment.

## I.    BACKGROUND

The Plasterers and Cabinet Makers Health Fund ("Fund") is a jointly-trusted and administered multi-employer ERISA fringe benefit plan. Goebel is an employer that has a collective bargaining relationship with the Carpenters Industrial Council, United Brotherhood of Carpenters & Joiners of America, Local 1865 ("Union"). Goebel and the Union are parties to a Collective Bargaining Agreement ("CBA"), under which Goebel is required to make contributions to the Trustees' Fund for group health insurance benefits. These benefits are to be provided by the Plasterers and Cabinet Makers Insurance Trust in accordance with the provisions set forth in an Agreement and Declaration of Trust ("Trust Agreement").

1

The Union and Goebel executed the CBA on July 14, 2010. The preamble of the CBA provides that the CBA was entered into "between GOEBEL FIXTURE COMPANY ('Company'), located at 528 Dale Street, Hutchinson, Minnesota, and Carpenters Industrial Council, United Brotherhood of Carpenters & Joiners of America, Local Union No. 1865 ('Union')." Article 1, Section 1 of the CBA (the "Union Recognition" clause) provides:

> It shall be a condition of employment that all employees of the Employer under this Agreement, namely, machine hands, cabinet makers, gluers and other production employees, including summer and part-time help in those classifications, who are members of the Union in good standing on the execution date of this Agreement shall remain members in good standing and those who are not members on the execution date of this Agreement shall on the ninetieth (90th) calendar day following the execution date of this Agreement become and remain members in good standing of the Union. It shall also be a condition of employment that all employees covered under section 1 of this Article and hired on/or after its execution date shall on the ninetieth (90th) calendar day following the beginning of such employment become and remain members in good standing in the Union.

Article 4, Section 5 of the CBA (under "Management Rights") provides:

> The Company may transfer work between any of its facilities. It may also determine the location of the business, including the establishment of new plants, facilities, departments, divisions, or subdivisions and may relocate, sell, lease or close the same.

Article 4, Section 6 of the CBA states that Goebel "has the right to subcontract or contract any work," including work that the bargaining unit is equipped to perform. Article 6, Section 1 relates to seniority, and provides that new employees must serve a ninety-day probationary period before they can receive the benefits provided for in the CBA.

Article 20, Section 1 of the CBA ("Health Insurance") requires Goebel to make contributions to the Trustees' Fund:

> For work performed for the duration of this Agreement, the Employer shall provide group health insurance benefits for each eligible regular full-time employee and his or her dependents. The benefits shall be provided through the Plasterers and Cabinet Makers Insurance Trust in accordance with the provisions

of the Agreement and Declaration of Trust and Plan Document of that Trust. Those documents are incorporated herein by reference.

The Trust Agreement, incorporated by reference into the CBA, requires that contributions be made in accordance with the terms of the CBA. Article IV, Section 4.1(a) provides:

> Each Employer shall make prompt contributions or payments to the Trust Fund . . . in the amount and according to the terms provided in the applicable collective bargaining agreement in effect between the Employer or the bargaining representative and the Union . . . .

The Trust Agreement further provides that "[e]ach Employer shall be responsible only for the contributions payable by him/her on account of Employees covered by him/her." Trust Agreement, Art. IV, Sec. 4.1(c). The Trust Agreement defines "Employee" as: "Any employee represented by the Union and working for an Employer as defined herein, and with respect to whose employment the Employer is required to make contributions into the Trust Fund." *Id.* Art. I, Sec. 1.4(a).

Goebel's main facility is located at 528 Dale Street, Hutchinson, Minnesota ("Hutchinson facility"). On March 1, 2010, Goebel acquired and began operating a facility in Minnetonka, Minnesota ("Minnetonka facility"). Sometime before the July 14, 2010 execution of the CBA, Goebel's attorney informed Trustee Kern that Goebel had acquired the Minnetonka facility and that it "would be a separate, stand-alone facility" and "would not be part of this bargaining unit, and that it was its own entity." Kern Dep. 71:4-24. The Union and Goebel both appear to have understood that the Minnetonka employees were not covered by the CBA. For example, it is undisputed that the Union has not filed any grievances under the CBA on behalf of Minnetonka employees; the Union has not collected dues from Minnetonka employees; the Union has not attempted to invoke the CBA's union security provision with respect to Minnetonka employees; Minnetonka employees do not vote in Union officer elections; the Union health fund has not

3

covered Minnetonka employees and has not provided any benefits to them; and Minnetonka employees are subject to different wage rates, work schedules and policies, and are provided with different insurance benefits (including participation in company-sponsored health insurance plans).

On September 21, 2011, the Wilson McShane accounting group conducted an audit of Goebel and questioned whether Goebel should be contributing to the Fund on behalf of Minnetonka employees. The auditors believed that although the Minnetonka employees were not members of the Union, they were nevertheless covered by the Fund because the Minnetonka employees occupied similar job classifications and performed similar work as the Hutchinson employees. Based on this belief, William McShane advised Goebel that it owed $516,030.90 in delinquent contributions and liquidated damages to the Fund. Goebel does not dispute that it never made contributions on behalf of its Minnetonka employees. Rather, Goebel asserts that it was never obligated to make contributions on those employees' behalf. Plaintiffs then brought this action, seeking collection of the allegedly delinquent fringe benefit contributions.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the

4

record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmoving party must substantiate his allegations by "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotation marks omitted).

Trustees allege that Goebel was obligated under the CBA to make fringe benefit contributions on behalf of the Minnetonka employees, and that Goebel's failure to do so constitutes a breach of the CBA. They therefore contend that they are entitled to collect the allegedly delinquent fringe benefit contributions under Section 515 of ERISA. Goebel argues that this dispute implicates a primarily representational question that is exclusively within the jurisdiction of the National Labor Relations Board ("NLRB"). Goebel therefore asserts that the Court should dismiss the action for lack of subject matter jurisdiction.

The Trust Agreement requires contributions only for employees represented by the Union. It is undisputed that the Minnetonka employees were never, in fact, represented by the Union and were never members of the Union. Thus, the Trustees can only be entitled to the sought-after contributions *if* the Minnetonka employees were covered by the CBA, which would have required Goebel to make those employees members of the Union. Notably, neither the employees nor the Union make such an argument. In fact, the Union, Goebel, and the Minnetonka employees all appear to agree that those employees are *not* covered by the CBA and are not—and should not be required to become—members of the Union. The Fund also stands apart from the Carpenters Labor-Management Pension Fund ("Pension Fund"), which under the CBA is entitled to employer contributions "for each employee covered by this Agreement," and presumably would also have an ERISA claim against Goebel if the CBA required Goebel to

5

make contributions to the Pension Fund for the Minnetonka Employees. The Pension Fund, however, is not a party to this lawsuit and does not appear to be seeking any past-due contributions from Goebel. This case therefore presents the unique scenario in which the Trustee's Fund—and *only* that Fund—maintains that a certain group of employees should have been required to become Union members under a CBA.

> Section 515 of ERISA provides:
>
> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145 (2006). Federal district courts have subject-matter jurisdiction over claims for delinquent fringe benefits contributions pursuant to § 502(e)(1) of ERISA, 29 U.S.C. § 11432(e)(1).

Section 7 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 157 (2006), provides that employees have the right to join or refrain from joining a union. Section 9(b) provides:

> The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . .

29 U.S.C. § 159(b). Federal district courts do not have jurisdiction to determine representational issues. *See Constr., Bldg. Material, Ice & Coal, Laundry, Dry Cleaning, & Indus. Laundry & Dry Cleaning Drivers, Helpers, Warehousemen, Yardmen, Salesmen, & Allied Workers, Local 682 v. Bussen Quarries, Inc.*, 849 F.2d 1123, 1124-25 (8th Cir. 1988); *Local Union 204, Int'l Bd. of Elec. Workers v. Iowa Elec. Light & Power Co.*, 668 F.2d 413, 419-20 (8th Cir. 1982); *Couchigian v. Rick*, 489 F. Supp. 54, 56 (D. Minn. 1980).

In *Iowa Electric Light & Power Co.*, 668 F.2d 413, the union brought an action for a breach of a collective bargaining agreement, seeking a determination that Quality Control Inspectors (or "QCIs") were "employees" covered by the CBA; the employer argued that QCI's were not employees represented by the union. Even though the case was presented as a contract dispute, the Eighth Circuit Court of Appeals characterized the issue as a "union representational matter" and explained that "representational matters have been almost invariably processed administratively through the NLRB under section 9 of the Act, with judicial review of the Board's determination by the courts of appeals under section 10 of the Act." *Id.* at 416. "Courts have found, in circumstances similar to those now before this court, that a dispute over a representational matter is a situation calling for a denial of district court jurisdiction." *Id.* The court referenced the "important federal labor law policy of deference to NLRB determinations of representational issues" and recognized the "'very, very strong policy' of using the procedures for representational determinations vested in the NLRB to promote industrial peace." *Id.* at 417-19 (citation omitted). "To fail to apply this policy to section 301 actions would allow an 'end run' around provisions of the NLRA under the guise of contract interpretation." *Id.* at 419. "We believe the appropriate line between those cases where the district court has jurisdiction under section 301 and those in which it does not is to be determined by examining the major issues to be decided as to whether they can be characterized as primarily representational or primarily contractual." *Id.* at 419. The court reasoned that the parties' attempt to "have the district court review the question of whether QCI's are 'employees' covered by the collective bargaining agreement, [was] actually a poorly veiled attempt to obtain direct review of a representational matter by invoking section 301 contract jurisdiction." *Id.* at 420. "To allow such a result would render nugatory sections 8, 9 and 10 of the Act, 'for every dispute concerning the appropriate

bargaining unit could be recast in terms of a breach of an "alleged" bargaining agreement.'" *Id.* (quoting *Couchigian*, 489 F. Supp. at 57). The court concluded:

> The well established policy of the National Labor Relations Board preeminence in determinations on representational matters in order to promote industrial peace, and the strong policy favoring an orderly process of judicial review of such matters dictate that the district court not exercise jurisdiction when the determination to be made is actually one of representation.

*Id.*

Similarly, in *Bussen Quarries*, 849 F.2d 1123, the issue presented was whether owner-operators were employees of the defendant to whom the terms of a collective bargaining agreement, including an arbitration provision, applied. The district court dismissed the complaint for lack of jurisdiction, holding that resolution of the dispute "required a determination of whether the owner-operators are employees of Bussen" and that "question of employee status is a representational issue which can be raised only before the National Labor Relations Board." *Id.* at 1125. The Eighth Circuit agreed, stating that "[w]hether the grievances fall within the scope of the arbitration clause in the bargaining agreement requires a determination of whether the grievants are employees of Bussen." *Id.* "Such a determination, however, is a representational issue because § 9 of the National Labor Relations Act rests jurisdiction in the NLRB to determine questions of representation." *Id.* "Thus, a representational issue can be raised only before the NLRB and falls within its exclusive or primary jurisdiction." *Id.* The court held that the union's "attempt to have this court review the question of whether the three individuals are 'employees' covered by the collective bargaining agreement is an attempt to obtain direct review of a representational matter" over which a federal court does not have jurisdiction. *Id.*

In order for the Court to reach the merits of the present case, the Court would have to determine whether the CBA obligated Goebel to make fund contributions on behalf of the Minnetonka employees. The CBA provides that Goebel must "provide group health insurance benefits for each eligible regular full-time employee . . . in accordance with the provisions of the [Trust Agreement]." CBA Art. 20, Sec. 1. The CBA does not define "eligible regular full-time employee."[1] The Trust Agreement, however, which is incorporated by reference, provides that Goebel is responsible "only for the contributions payable by him/her on account of Employees covered by him/her." Trust Agreement, Art. IV, Sec. 4.1(c). It defines "Employee" as "[a]ny employee represented by the Union and working for an Employer as defined herein, and with respect to whose employment the Employer is required to make contributions into the Trust Fund." *Id.* Art. I, Sec. 1.4(a). Therefore, under the plain terms of the Trust Agreement and CBA, Goebel is responsible for fund contributions only for those employees "represented by the Union."

It is undisputed that the Minnetonka employees were *not* represented by the Union. The question presented, therefore, is whether they *should have been* represented by the Union—i.e., whether under the terms of the CBA, Goebel was required to make the Minnetonka employees become members of the Union. Trustees assert that the CBA defines "employee" as *all* "machine hands, cabinet makers, gluers and other production employees" employed by Goebel. The Court does not read the "Union Recognition" provision as such a clear definition—for example, it does not say "*all* machine hands, cabinet makers, gluers and other production

---

[1] Trustees contend that the seniority provisions of the CBA define eligibility. The Court disagrees. Rather, these provisions only state that employees may not receive the benefits provided for in the CBA until they have completed their probationary period. The Court does not construe this language as a definition of "eligible regular full-time employee" as used in the health insurance provisions, especially in light of the explicit reference to the provisions of the Trust Agreement.

9

employees." Nor does the CBA contain any language—although it easily could have done so—indicating that the agreement applies to all Goebel employees wherever they may be located. Instead, the CBA merely refers to "all employees of the Employer under this Agreement." But it is not clear whether "under this Agreement" modifies "employees" or "Employer." Even if it modifies "employees," it is not clear *which* employees are covered "under this Agreement." The preamble of the CBA identifies Goebel's location as 528 Dale Street, Hutchinson, Minnesota—a location at which Goebel maintains both a plant and its headquarters. It is possible that the CBA only applies to the "machine hands, cabinet makers, gluers and other production employees" located at the Hutchinson facility. It is also possible that the CBA applies to all Goebel employees—at any facility—that perform those types of work. The CBA is reasonably susceptible to both interpretations.

The CBA does not provide any other definition of "employee." Nor does the CBA contain a work jurisdiction clause, after-acquired facility clause, or any other clause indicating the CBA's scope, the unit represented by the Union, or the Union's jurisdiction. This CBA—unlike other CBAs—does not even require that Goebel utilize only Union labor to perform bargaining unit work. For example, Article 4, Section 5 provides that Goebel may transfer work between its facilities and establish new facilities, but is silent as to the status of the employees at those other facilities. Article 4, Section 6 permits Goebel to contract or subcontract out "work that the bargaining unit is equipped to perform." Thus, it is entirely unclear from the face of the CBA what the relevant bargaining unit is and to which employees the CBA applies.

Based on the course of dealing between Goebel and the Union, it appears that no such representation was ever anticipated. Trustees note that under ERISA, the Fund is "placed in a better position, analogous to that of a holder in due course or a receiver of a failed bank—

10

'entitled to enforce the writing without regard to understandings or defenses applicable to the original parties,'" including a contract construction that is not based on the contracting parties' course of dealing. *See Cent. States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1348 (8th Cir. 1990) (citation omitted). The Eighth Circuit has held that where the written agreement provided to a fund is unambiguous on its face and the parties to the contract failed to inform the fund of any alternative meaning they assigned to the terms of the contract, the fund is entitled to rely on the unambiguous terms as they appear in the agreement. *Id.* at 1353. But while extrinsic evidence of the contracting parties' understanding—such as their intent, course of conduct or other agreements—that is unknown to a fund should not bear on the fund's rights under ERISA, the intent of the contracting parties *is* relevant "if it is conveyed to the other party and shared." *Id.* (internal quotation marks omitted).[2]

Here, neither the CBA nor the Trust Agreement provides an unambiguous statement of which employees are or should be represented by the Union—and the Trust Agreement only requires contributions for Goebel employees "represented by the Union." Not only are the agreements ambiguous on their face, but the Fund *was* specifically notified—after the Minnetonka facility became operational and before the CBA was executed—that the Minnetonka employees were not part of the bargaining unit and not covered under the CBA. Goebel's attorney informed Trustee Kern, before the CBA was executed, that the Minnetonka facility would not be part of the bargaining unit, and Kern never requested any further explanation of the status of the Minnetonka employees. *See* Kern Dep. 72:6-8. Trustee Kern—a Trustee of the Fund for over ten years—was also a Business Agent for the Union, and as such was aware of the

---

[2] The Court notes that, unlike in the present case, the parties in *Central States* agreed that the disputed employees were part of the bargaining unit. *Id.* at 1348 n.4. Thus, *Central States* did not raise an issue of representation.

11

course of conduct between the Union and Goebel and the fact that the Union did not and never sought to represent the Minnetonka employees. It was Kern, in fact, who negotiated the CBA at issue in this litigation. From the time the CBA was executed until the audit, there is no evidence or argument that the Fund ever understood the CBA language to require Union membership of or employer contributions for the Minnetonka employees. During that time, the Fund never acted in a way suggesting that it harbored such a belief or understood the CBA's language in a manner differently than Goebel and the Union. It was only after the audit that the Trustees thought to bring suit to collect contribution payments. Thus, although the Fund now contends that the CBA language unambiguously requires employer contributions for the Minnetonka employees, the Fund never behaved in a way consistent with that "unambiguous" interpretation, and at all times the Fund—at least through its Trustee—understood that those employees were *not* covered by the CBA or represented by the Union. The Fund's reason for that understanding is irrelevant.[3]

---

[3] Trustees emphasize the fact that Kern was allegedly told that the Minnetonka facility would be "its own entity." It seems as though Kern may have assumed that by being "its own entity," the Minnetonka facility would actually be an entirely different company, unaffiliated with Goebel Fixture Company in every way other than ownership. Kern Dep. 83:4-7. But there is nothing in the record to support Kern's assumptions or to suggest that Goebel indicated that the Minnetonka employees would not be "Goebel" employees. Even when Kern was approached by other Union stewards approximately six months after the CBA was executed with this very question of whether the Minnetonka facility was part of the same company as the Hutchinson facility, Kern still did not pursue this issue or request clarification from Goebel. Kern's only response to the stewards' inquiry was that "the company can do what they want to do," *id.* 73:24-25, thus suggesting that even Kern considered the two facilities to be part of "the company." The audit indicated that the Hutchinson facility was part of Goebel, and not operated some other corporate entity. While this may have been news to Kern, who had apparently believed the Minnetonka facility was going to be "completely disassociated with Goebel Fixture Company," *id.* 83:4-7, it does not alter the fact that the Fund never interpreted the CBA as providing coverage for the Minnetonka employees and never acted in a way consistent with such an interpretation. This is not a case where the Fund lacked notice of the understanding between the employer and the Union, or where the Fund's alternative interpretation of the CBA could result in the Fund's payment of "benefits without corresponding contributions" or interfere with the reliability of the Fund's actuarial assumptions. *See Cent. States*, 919 F.2d at 1348 (internal quotation marks omitted).

Trustees also rely on *Moriarty v. Svec*, 164 F.3d 323 (7th Cir. 1999), a Seventh Circuit ERISA case. The court in *Moriarty*, like the Eighth Circuit, examined whether the issue presented was a representational matter, and concluded that it was not. The fundamental question in *Moriarty* was whether two entities constituted a "single employer," a question squarely within the traditional jurisdiction of the district court. *See id.* at 332. The CBAs in *Moriarty* "required contributions on behalf of all employees of employer members who performed livery services," and did "not define coverage based on any collective bargaining unit." *Id.* at 334. Thus, once the Court determined that the two entities were, in fact, a "single employer," the consequences involving the employer's obligations under the CBA naturally flowed. The court concluded under those circumstances that "nothing in the present case implicates representation or unfair labor practices" and that "no NLRB issue is present here." *Id.* In contrast, here the question from which all other answers flow is whether the Minnetonka employees were required to become members of the Union. Unlike in *Moriarty*, the CBA and Trust Agreement at issue here do, in fact, define coverage based on Union representation.

Trustees maintain that the only consequence of a finding in their favor is that the Fund would be able to collect money from Goebel, and there would be no collateral consequences in terms of Union representation. And in other cases, such as in *Moriarty*, that might be true. But here, because of the specific language of the Trust Agreement and CBA, a finding of liability hinges on a determination of representation. Other than the Trust Agreement and CBA, there is no stand-alone contract—nor does the Fund assert that there is one—that requires contributions for non-Union employees. Under the terms of the Trust Agreement, the Fund is only entitled to contributions for those Goebel employees "represented by the Union," in accordance with the terms of a CBA in effect between the Union and Goebel. The Minnetonka employees have

13

never been represented by the Union, and the Court can only conclude that they should have been represented by the Union if the Court finds that the CBA applies to the Minnetonka employees and that under the CBA's "Union Recognition" clause, Goebel was required to make the Minnetonka employees become members of the Union. Here, the Fund urges the Court to adopt a position with which neither the Union nor the Minnetonka employees appear to agree.

There are many consequences that could result from a determination that the Minnetonka employees should have been made part of the Union, only one of which is that Goebel would be required to make contributions to Trustee's health fund. If the Court were to construe the CBA so as to impose upon Goebel the obligation to make *all* of its employees—including the Minnetonka employees—members of the Union, then other obligations would follow— obligations that could potentially infringe upon those employees' rights under Section 7 of the NLRA, 29 U.S.C. § 157 (2006). Because of the unique facts presented by this case, the relief sought by the Fund cannot be separated from the other obligations that the employer (and employees) would have under the Fund's reading of the CBA. The language of the specific agreements at issue here makes the Fund's ERISA claim inseparable from issues of representation. And those issues of representation are beyond this Court's expertise and outside of its jurisdiction.

In sum, the present case involves facially ambiguous written agreements that by their very terms raise an issue of representation. Regardless of how the parties cast this dispute, the Court cannot determine whether Goebel had an obligation to make fund contributions on behalf of the Minnetonka employees without first resolving the question of whether those employees were part of the bargaining unit represented by the Union or required to become Union members under the terms of the CBA. The question that the parties ask the Court to resolve can be

characterized in no other way than "primarily representational." *See Iowa Electric Light & Power Co.*, 668 F.2d at 419. Although this case arises in the ERISA context, rather than under the LMRA, it, too, appears to be a "poorly veiled attempt to obtain direct review of a representational matter."[4] *Id.* at 420. The Court cannot address this question without stepping into the exclusive province of the NLRB. *See* 29 U.S.C. § 159(b); *Bussen Quarries, Inc.*, 849 F.2d at 1124-25; *Iowa Electric Light & Power Co.*, 668 F.2d at 419-20; *Couchigian v. Rick*, 489 F. Supp. at 56 ("It is well established that section 9(b) vests in the Board the exclusive jurisdiction to determine the appropriate bargaining unit."). *See also ABF Freight Sys., Inc. v. Int'l Bd. of Teamsters*, 645 F.3d 954, 965 (8th Cir. 2011) (suggesting that where a case "turn[s] on primarily representational issues," such as whether a certain category of individuals are "employees covered by the agreement," then the NLRB has exclusive jurisdiction); *United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., Steamfitters & Refrigeration Union, Local 342, AFL-CIO v. Valley Eng'rs*, 975 F.2d 611, 614 (9th Cir. 1992) ("Where '[t]he interpretation of the contract depends entirely on the resolution of the question of whom the union represents,' the matter is 'properly left to the Board.'" (citation omitted)). The case is therefore dismissed for lack of subject matter jurisdiction.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant's Motion for Summary Judgment [Docket No. 18] is GRANTED.

2. Plaintiffs' Motion for Summary Judgment [Docket No. 22] is DENIED.

---

[4] The Court notes that Trustee Kern, in his role as a Business Representative for the Union, at one time considered—and decided against—filing an accretion petition with the NLRB. Kern Dep. 68:15-69:13.

15

3. This action is DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 4, 2013

s/Joan N. Ericksen  
JOAN N. ERICKSEN  
United States District Judge